# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGINA FAYE EVANOVICH, | Case No. 1:18–cv–01438–SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| ANDREW SAUL, Commissioner of Social Security,[1] | |
| Defendant. | (Doc. 1) |
| _____/ | |

## I.      INTRODUCTION

On October 18, 2018, Plaintiff Regina Faye Evanovich ("Plaintiff") filed a complaint under 42 U.S.C. §§ 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her applications for disability insurance benefits ("DIB") and Supplemental Security Income (SSI) under the Social Security Act (the "Act").  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on September 12, 2019).  He is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

Judge.[2]

## II.   BACKGROUND

Plaintiff was born on July 29, 1978, completed college, and previously worked as a caregiver, library page, and as a customer service representative. (Administrative Record ("AR") 40, 54–55, 98, 112, 230, 243, 249, 267, 274, 307, 319.) Plaintiff filed claims for DIB and SSI payments on April 3, 2015, alleging she became disabled on March 17, 2015, due to temporomandibular joint (TMJ) syndrome, ulcerative colitis, anxiety, post-traumatic stress disorder (PTSD), and bilateral occipital neuralgia. (AR 28, 98, 112, 129, 132, 144, 147, 266.)

### A.   Relevant Medical Evidence[3]

#### 1.   Virginia Mason Medical Center

On January 6, 2014, Plaintiff complained of mood swings and trouble sleeping. (AR 374.) Her past medical history of ulcerative colitis was noted. (AR 375.) Physical examination revealed good grooming and hygiene. (AR 375.) Plaintiff had appropriate behavior and affect, normal speech, coherent thought process, but anxious mood. (AR 375.) Plaintiff was diagnosed with bipolar disorder type II, PTSD, and borderline personality disorder. (AR 375.) She was a refill of clonazepam to for panic attacks and was directed to regulate sleep with Seroquel. (AR 374.)

#### 2.   Tacoma General Hospital

On March 1, 2015, Plaintiff was transported to the emergency department after she threatened suicide while going into the bathroom with a large kitchen knife. (AR 386–403.) She was caring for her terminally ill ex mother-in-law at the time. (AR 386.) Plaintiff reported having vertigo, which made it difficult for her to read. (AR 386.) Her mental status examination showed she was cooperative but with intermittent eye contact. (AR 388.) She was alert and fully oriented with normal motor movements. (AR 388.) The assessment of her affect was stable and within normal limits in range. (AR 388.) Although her thought stream was circumstantial, Plaintiff was coherent and logical with intact short-term and long-term memory and fair insight/judgment. (AR 388.)

---

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 13, 17.)

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

**3.** **Shawn K. Kenderdine, Ph.D.**

Dr. Kenderdine completed a "Psychological/Psychiatric Evaluation" form for the Washington State Department of Social & Health Services in March 2015. (AR 934–39.) He indicated the records he reviewed were the "Beck Depression Inventory" and the "Beck Anxiety Inventory." (AR 934.) Plaintiff's diagnoses were listed as borderline personality disorder, depression, and "multiple somatic complaints." (AR 934.) With respect to her activities of daily living, Dr. Kenderdine found that Plaintiff is "cognitively capable of performing" them, but her "socialization levels are impaired." (AR 935.) Plaintiff's prognosis was listed as "fair with sustained intervention." (AR 935.) Dr. Kenderdine noted that Plaintiff "has been able to sustain employment and has a satisfactory work [history]; she feels that her medical complaints will interfere with her ability to work but she has been working with these complaints for several [years]." (AR 935.)

With respect to clinical findings, Plaintiff's mental status examination was normal except for thought process and content, insight, and judgment, which Dr. Kenderdine found were not within normal limits. (AR 937–38.) With respect to basic work activity, Dr. Kenderdine found Plaintiff had moderate limitations in her ability to: adapt to changes in a routine work setting; communicate and perform effectively in a work setting; complete a normal work day and work week without interruptions from psychologically based symptoms; maintain appropriate behavior in a work setting; and set realistic goals and plan independently. (AR 936.) All other areas had mild or no limitations. (AR 936.)

Dr. Kenderdine completed another "Psychological/Psychiatric Evaluation" form for the Washington State Department of Social & Health Services in April 2016. (AR 951–57.) With respect to Plaintiff's activities of daily living, he observed Plaintiff:

> is cognitively capable of performing [such activities] and does them on a fairly routine basis. Her brother helps her with shopping as she says she makes bad choices. She does some light housework and enjoys reading. She either obtains rides or drives herself although this can be problematic due to some other somatic [symptoms]. She is capable of attending scheduled appointments and taking her meds as prescribed. She spends time talking to her brother and housemates and reads a good deal. She says that she has started walking more to improve mental and physical status.

1  (AR 952.) Dr. Kenderdine's basic work activity findings were largely the same as in March 2015,

2  with the addition of a moderate limitation in Plaintiff's ability to make simple, work-related

3  decisions. (AR 953.) His clinical findings were the same as before, except that insight and

4  judgment were now within normal limits. (*Compare* AR 954–55 *with* AR 937–38.)

5          **4.      Multicare Health System**

6          In April 2015, Plaintiff participated in physical therapy sessions to address her neck pain

7  and vertigo. (AR 427–34.) She reported that she is walking one hour per day and working out at

8  the gym to strengthen her core. (AR 434.) Plaintiff also reported wanting to try exercise in the

9  pool. (AR 434.) She stated that since she has starting walking and exercising, her body feels better

10 with less pain. (AR 434.)

11         Plaintiff presented to a neurologist for a follow-up appointment in June 2015. (AR 425–

12 26.) She reported having adverse reactions to medication and expressed an interest in not

13 continuing to take them. (AR 425.) She stated she was taking a belladonna compound, which

14 seemed to be helping with her mood. (AR 425.) Her vertigo was "still pretty bad." (AR 425.)

15 Plaintiff reported getting "some relief" of her TMJ pain from massage and local treatments, but

16 still was having a lot of preauricular pain that radiated to the back of her head. (AR 425.)

17         In October 2015, Plaintiff contacted her neurologist about tapering her medication for TMJ

18 symptoms. (AR 637.) According to Plaintiff, her condition had improved so greatly that she cut

19 her dose of medication in half, but returned to the full dosage when her pain increased. (AR 637.)

20 Later that month, Plaintiff's neurologist observed that her "biggest problem has been her behavioral

21 health issues" and that Plaintiff had started having some hallucinations as a result of her medication.

22 (AR 636.)

23         Plaintiff reported continuing to receive TMJ massage in November 2015, which she

24 believed helped the condition. (AR 634.). She also reported her ulcerative colitis was "flaring up

25 intermittently" and causing gastrointestinal bleeds, while accompanied by fatigue and occasional

26 moderate abdominal pain. (AR 634.) In November 2015, it was noted that Plaintiff has a "history

27 of behavioral health problems and possible bipolar spectrum" and was "currently being treated for

28 PTSD and borderline personality disorder." (AR 634.)

1    Treating physician Remi Gallevo, M.D., completed a "Physical Function Evaluation" form

2    for the Washington State Department of Social and Health Services in March 2016.  (AR 958–60.)

3    He indicated that Plaintiff had marked limitation in a variety of basic work activities due to her

4    "TMJ disorder" and neck pain.  (AR 959.)  He further opined that Plaintiff retained the capacity to

5    perform only sedentary work, i.e., "[a]ble to lift 10 pounds maximum and frequently lift or carry

6    lightweight articles [and] [a]ble to walk or stand only for brief periods."  (AR 960.)  According to

7    Dr. Gallevo, Plaintiff's limitations were estimated to persist six months with medical treatment.

8    (AR 960.)  Although he indicated he had attached clinical reports to his form (AR 959), none were

9    attached.  At the office visit that same day, Plaintiff stated that "she is doing better overall" and

10   mentioned she was undergoing chiropractic therapy, but still experiencing neck and jaw pain when

11   stationary for too long or when she lifts her arms.  (AR 788.)  She reported she has been "border

12   line bipolar" for some time, but that her therapist does not believe she is bipolar.  (AR 788.)  She

13   was diagnosed with severe PTSD and noted she was undergoing trauma therapy.  (AR 788.)

14   Plaintiff presented for a routine physical examination with Dr. Gallevo in August 2017.

15   (AR 835–39.)  She reported she had been active, eating better, and trying to lose weight.  Her PTSD

16   symptoms were listed as "stable" and her ulcerated colitis "controlled."  (AR 835.)  The

17   examination, in its review of symptoms, found Plaintiff negative for tension, stress, anxiety,

18   depression, mood swings, appetite changes, and sleep pattern changes.  (AR 836.)  The objective

19   findings were normal, with strong muscle strength, normal tone, steady gait, and straight spine.

20   (AR 836.)

21   In October 2017, Dr. Gallevo completed a "Physical Medical Source Statement" form.  (AR

22   1025–30.)  He listed diagnoses of ulcerative colitis, severe PTSD, and occipital neuralgia.  (AR

23   1025.)  He opined Plaintiff was "seriously limited" in sustaining an ordinary routine without special

24   supervision and in working in coordination with or proximity to others without being unduly

25   distracted. (AR 1026.)  Dr. Gallevo found that Plaintiff was able to sit and stand for 30 minutes at

26   a time, with sitting and standing/walking for less than two hours in an eight-hour workday.  (AR

27   1028.)  He indicated that Plaintiff would need to shift positions and periods of walking around

28   during the workday.  (AR 1028.)   According to Dr. Gallevo, Plaintiff also needed to take

5

unscheduled breaks of 15 to 30 minutes during the workday as often as two or three times every four to five hours.  (AR 1028.)  She could also lift and carry less than 10 pounds occasionally and 10 pounds rarely.  (AR 1029.)  Twisting, stooping, crouching, climbing stairs, and climbing ladders could only be done occasionally.  (AR 1029.)  Dr. Gallevo further opined Plaintiff would be off task 25% or more during a typical day and absent from work for more than four days per month.  (AR 1029–30).

**5.      Valley Cities Counseling**

During a therapy session in May 2015, Plaintiff reported having a "particularly difficult week."    (AR  618.)    The  therapist  noted  that  although  Plaintiff  was  "depressed"  and "acknowledge[d] anger and frustration," she denied suicidal ideation.  (AR 618.)  In June 2015, Plaintiff's therapist noted she was "distressed, tearful, [with] [suicidal ideation] and thoughts of violence in past several days."  (AR 620.)  Plaintiff's suicidal ideation was further noted later that month.  (AR 623, 626)

In July 2015, Plaintiff underwent a mental evaluation.  (AR 536–37.)  Plaintiff was found to be "alert and oriented times three."  (AR 536.)  She was very calm, polite, and cooperative during her intake interview, with no restlessness or agitation noted.  (AR 536.)  She was casually dressed, with good hygiene.  (AR 536.)  Plaintiff presented with a "mixed" mood: there were times when she "unsuccessfully restrain[ed] crying."  (AR 536.)  She had a "full" and expressive affect that was congruent with the conversation.  (AR 536.)  Her speech and eye contact were noted as appropriate.  (AR 536.)  Plaintiff's thoughts were noted to be coherent and logical without loose associations  or  tangential  thinking.    (AR 536.)    Her  judgment  was  "fair"  and  her  insight "developed."  (AR 536.)  Plaintiff's primary diagnosis was listed as bipolar I disorder, with PTSD ruled out.  (AR 537.)  She was assessed a Global Assessment of Functioning (GAF) score of 45.  (AR 537.)

Plaintiff reported during a therapy session in August 2015 that she was "doing much better" and the couple with whom she had moved in had been "very helpful and supportive."  (AR 654.)  She continued to have some medical issues and pain, but they have "decreased in intensity."  (AR 654.)  The therapist noted Plaintiff's "positive and upbeat mood," "some reduction in pain," and

an "increased sense of hope and competency [that Plaintiff] attributes the changes mostly to improved living situation and support."  (AR 654.)

In October 2015, Plaintiff again reported she was "doing well."  (AR 658.)  Her therapist observed Plaintiff was talkative and smiled throughout the session with an "upbeat" mood.  (AR 658.)  Plaintiff spoke enthusiastically about opening a photography studio.  (AR 658.)  Later that month, however, she reported having "more depression" and suicidal ideation for the past week.  (AR 660–61.)

At her medication management appointment in November 2015, Plaintiff made good eye contact, but her facial expressions were listed as "sad," and she was noted to be crying at times.  (AR 669.)  She had an "okay" mood and reported ongoing depression and anxiety.  (AR 668–69.)  It was noted that Plaintiff's thoughts appear coherent and logical without loose associations or tangential thinking.  (AR 669.) Her attention, concentration, and memory were all "intact" and her judgment/insight fair.  (AR 669.)

In December 2015, Plaintiff reported "doing well" and noted that her increase in medication is "helping her depression."  (AR 671.)  She reported walking her dog more often and receiving a gym membership for Christmas from her family.  (AR 671.)  She was refraining from thoughts of suicide.  (AR 671.)  On examination, her grooming was good with appropriate eye contact.  (AR 672.)  Her mood was "okay," and her affect noted as "improved and full range," with "no crying as last visit."  (AR 672.)  She had appropriate speech and her thought processes appeared to be coherent and logical.  (AR 672.)  Her attention, concentration, and memory were intact, with fair judgment and insight.  (AR 672.)

At a therapy session in January 2016, Plaintiff presented with "heightened emotions" and was "tearful at times."  (AR 675.)  Plaintiff expressed an interest in reducing her medication in March 2016.  (AR 679, 944.)  A mental status examination showed "improved" grooming and appropriate eye contact.  (AR 679, 944.)  She was observed to be in a good mood and calm.  (AR 679, 944.) Plaintiff again had appropriate speech and her thought processes appeared to be coherent and logical.  (AR 679, 944.)  Her attention, concentration, and memory were intact, with fair judgment and insight.  (AR 679, 944.)  At a therapy session that month, Plaintiff reported she was

1    doing "reasonably well" and continuing to volunteer at a dental clinic.  (AR 681.)  She indicated

2    the job was "stressful," partly due to the "physical demands, as she is asked to do "a fair amount."

3    (AR 681.)  Plaintiff stated her ability to "set limits with these demands."  (AR 681.)  Later than

4    month (March 2016), Plaintiff was noted to be "tearful and close to being overwhelmed during

5    processing."  (AR 683.)

6         In May 2016, Plaintiff expressed her belief that her depression and PTSD were improved

7    with the chiropractic treatment she was receiving.  (AR 866.)  On mental status examination, her

8    appearance was noted as casual and grooming improved.  (AR 866.)  She made appropriate eye

9    contact, with no restlessness or agitation seen.  (AR 866.)  Plaintiff reported that she is "okay," yet

10   "dizzy from clenching her jaw all night."  (AR 866.)  Plaintiff was reportedly calm, with an affect

11   of full range, appropriate speech, and coherent thought process.  (AR 866.)  Her thought content

12   was observed to be normal.  (AR 868.)  Plaintiff was noted to be alert, with intact concentration,

13   attention, and memory.  (AR 868.)

14        In July 2016, Plaintiff attended a therapy session where she focused on a future work area

15   as a wedding photographer.  (AR 876.)  As she thought more on the topic, Plaintiff began feeling

16   "more triggered and upset," as the area of photographic families was "more loaded emotionally

17   than [] anticipated."  (AR 876.)  A week later, however, Plaintiff reported that she had performed

18   a small amount of work photographing a family, for which she was paid.  (AR 877.)  "More

19   importantly, she said she felt positive about herself—for doing the work and taking on something

20   that is challenging for her (dealing with families)."  (AR 877.)  Plaintiff also reported resuming

21   writing, which she reportedly had not done in years.  (AR 877.)

22        In August 2016, Plaintiff reported to her therapist that had "a difficult week" the prior week,

23   with "thoughts of suicide and much increased intensity of emotion."  (AR 879.)  Later that month,

24   she was noted to be "distressed."  (AR 880.)  Plaintiff presented for a medication management

25   appointment in October 2016, and reported she is "overall doing well" and expressed an interest in

26   continuing her medication.  (AR 889–90.)  On mental status examination, her grooming was good,

27   but she smelled of tobacco.  (AR 889.)  She made appropriate eye contact with a calm affect.  (AR

28   889.)  Plaintiff's speech and language were appropriate, with coherent thought process and alert

1  orientation.  (AR 889.)  Her attention, concentration, and memory were all intact. (AR 889.)  Her

2  insight and judgment were observed to be good.  (AR 890.)

3        In December 2016, Plaintiff had "no concerns" and was "doing fairly well."  (AR 896.)

4  Her psychiatric examination results were the same as her prior visit in October 2016.  (AR 897.)

5  Plaintiff reported in March 2017 that she was "doing fairly well other than some depression" due

6  to breaking her foot the prior month.  (AR 904, 909.)  She had the same mental status examination

7  results as before, and indicated her mood was "ok . . . I have been better."  (AR 904.)

8        Plaintiff reported at a medication management appointment in June 2017 that she has been

9  having difficulty sleeping and "feeling down" due to a good friend of hers passing away recently.

10  (AR 909.)  She stated she has been handling the death "okay" and "attending therapy regularly has

11  been helpful."  (AR 909.)  She indicated feeling anxious.  (AR 909.)  Her mental status examination

12  showed good grooming, appropriate eye contact, and a calm demeanor.  (AR 909.)  She presented

13  with a calm mood.  (AR 909.)  Her language was appropriate, with coherent thought process, alert

14  orientation, and intact attention and concentration.  (AR 909.)  Plaintiff's insight was good.  (AR

15  909.)

16        In August 2017, Plaintiff reported that she was planning to move to California and was

17  "excited and a bit nervous."  (AR 917.)  Overall, she indicated she was "stable" and that engaging

18  in therapy has been "helpful."  (AR 917.)  Her psychiatric examination showed good grooming,

19  appropriate eye contact, and a calm demeanor.  (AR 916.)   Plaintiff's behavior was noted to be

20  pleasant, calm, and cooperative.  (AR 916.)  Her mood was "okay," with a "calm and euthymic"

21  affect and appropriate speech.  (AR 916.)  Plaintiff's thought processes were coherent and logical,

22  and her thought content normal.  (AR 917.)  She had an alert orientation; intact attention, memory,

23  and concentration; and good insight and judgment.  (AR 917.)

24        **6.**    **Rahul Khurana, M.D.**

25        Plaintiff presented for a consultative "disability evaluation" with Dr. Khurana in October

26  2015.  (AR 627–29.)  Dr. Khurana indicated he based his opinions on Plaintiff's "reliable self-

27  report," medical records (including "outpatient psych records from Valley Cities function report

28  for SSA"), and his "interview observations."  (AR 627, 629.)  Diagnoses of bipolar I, PTSD, eating

disorder, borderline personality disorder, social anxiety disorder, and rule out somatic symptoms were noted.  (AR 629.)  Dr. Khurana opined that "the complexity [and] severity of [Plaintiff's] medical psychiatric illnesses make[] it unrealistic for patient to ever work again in any meaningful long-term capacity."  (AR 629.)  Dr. Khurana further found that Plaintiff has "mild to moderate difficulty with simple instructions," and her "work-related judgments and ability to carry out more complex instructions" were "markedly to severely impaired."  (AR 629.)  Dr. Khurana stated that Plaintiff was "mildly to moderately impaired in understanding," and was severely disabled in sustained concentration and persistence and in making typical social interactions.  (AR 629.)  Dr. Khurana also found Plaintiff had "had marked difficulty in responding to changes in her work routine."  (AR 629.)

### 7. State Agency Physicians

In October 2015, state agency physician Leslie Postovoit, Ph.D., reviewed the record and assessed Plaintiff's mental residual functional capacity (RFC).[4]  (AR 106–08; AR 120–22.)  Dr. Postovoit opined that Plaintiff retained the capacity to perform simple routine tasks but would have difficulty with more complex instructions.  (AR 107, AR 120.)  Dr. Postovoit also found Plaintiff had difficulties with concentration, persistence, pace, and maintaining regular attendance, but noted that she could do so within the tolerances of a competitive workplace.  (AR 107, AR 120.)  He further opined that Plaintiff "should only have superficial contact with the general public and may require additional instruction from supervisors from time to time."  (AR 107, AR 121.)  As for adaption, Dr. Postovoit noted that Plaintiff would have "occasional difficulties with adapting to change," but would be "able to adapt to normal routine changes in a competitive workplace within normal tolerances."  (AR 108, AR 122.)

On reconsideration in June 2016, state agency physician James Irwin, M.D., reviewed the

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

record and reassessed Plaintiff's physical RFC.  (AR 134–37; AR 150–52.)  He opined that Plaintiff could lift and carry 50 pounds occasionally and 20 pounds frequently; that standing, walking, and sitting could each be performed for about 6 hours in an 8-hour workday; that Plaintiff was unlimited in the performance of postural activities, except for a restriction to only occasional climbing of ladders, ropes, and scaffolds; and that Plaintiff was unlimited in environmental activities except for the need to avoid concentrated exposure to hazards.  (AR 135–37; AR 151–52.)  In addition, Plaintiff's mental RFC was reassessed by Diane Fligstein, Ph.D., who reviewed the record and affirmed Dr. Postovoit's findings.  (AR 137–39; AR 152–54.)

### 8.   Lake Meridian Chiropractic

In December 2016, Plaintiff presented for a chiropractic adjustment complaining of jaw pain, neck pain, low back pain, and dizziness.  (AR 1014–15.)  She reported that her lower back had more pain as a result of moving boxes.  (AR 1014.)  She also reported that she didn't feel like she needed to wear her night guard throughout the day as she had previously because she was not "not clenching [her] teeth as hard."  (AR 1014.)

### 9.   Digestive Health Specialists

In January 2017, Plaintiff presented to the specialists to whom she had been referred by her primary care physician, Dr. Gallevo.  (AR 694–95.)  She reported being off her medication for colitis for the past two years, and instead was taking high doses of probiotics.  (AR 694.)  Plaintiff reported this was "working well" until recently, with the onset of some cramping, leakage, and a little bit of bleeding.  (AR 694.)  A colonoscopy was ordered.  (AR 695–96.)  The specialist encouraged Plaintiff to resume medication treatment rather than rely on probiotics.  (AR 696.)

**B.   Administrative Proceedings**

The Commissioner denied Plaintiff's applications for benefits initially on October 22, 2015, and again on reconsideration on June 30, 2016.  (AR 158–61; AR 173–92.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 193–209.)  The ALJ conducted a hearing on November 6, 2017.  (AR 48–95.).  Plaintiff appeared at the hearing with her counsel and testified.  (AR 54–85.)  A vocational expert also testified.  (AR 85–94.)

1      **1.      Plaintiff's Testimony**

2           Plaintiff testified that when she worked at the library shelving books, she would experience

3      an "episode" where she could not be around "certain people or things or even smells sometimes."

4      (AR 69.)  When she is "dealing with people" and it "doesn't work out," she "can't finish the job."

5      (AR 69.)  According to Plaintiff, she's "had a lot of bad things happen to her" that cause her to not

6      function.  (AR 70–71.)  She testified that she believed she could not return to a job as a book shelver

7      due to occipital neuralgia on both sides of her neck, inability to do repeated arm movements, and

8      difficulty interacting with people.  (AR 74, 76, 81.)  In 2016, she tried volunteering at a dental

9      clinic, but she couldn't sit and the dentist "was rather rude" to her, so she "left before there was a

10     scene."  (AR 55, 56.)  That same year, she served as a companion for her ex-mother-in-law and ran

11     errands at the store for her.  (AR 56–61.)  Earlier, in 2015, she had served as her ex-mother-in-law's

12     caregiver (scheduling, keeping track of medication, accompanying her to doctor's appointments,

13     preparing food) but suffered a "nervous breakdown" and couldn't continue that job.  (AR 57, 58,

14     59.)  Plaintiff testified that she "wasn't very functional at that period of time."  (AR 58.)

15          Plaintiff's colitis has been "generally better" since 2015, yet she still must use the bathroom

16     frequently.  (AR 74.)  She testified that her TMJ "bothers the nerve that runs through [her] ear,"

17     makes her dizzy, and caused the occipital neuralgia.  (AR 79, 80.)  There's "not a lot they can do"

18     for her TMJ, according to Plaintiff. (AR 79, 80.)  She testified that she received a mouth guard from

19     her dentist, who advised that they thought she might need surgery on her jaw.  (AR 79, 80.)

20     According to Plaintiff, her insurance would not cover oral surgery.  (AR 80.)

21          Plaintiff testified she has reconnected with a childhood friend, Dave, who lives in California

22     through Facebook.  (AR 71.)  She made a couple trips by airplane to California to visit him and

23     testified that she "took [her] pills and [] was okay" navigating the Seattle airport by herself.  (AR

24     72, 79.)  Recently, Plaintiff did some "pin-up portraits" photography for a couple and sold some

25     paintings.  (AR 65–67.)  She testified she is planning to move to California "because there's better

26     opportunity for a career in the arts" there.  (AR 65.)

27     **2.      Vocational Expert's Testimony**

28          A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a home

health aide, Dictionary of Operational Titles (DOT) code 354.377-014, which was medium exertional work, with a specific vocational preparation (SVP)[5] of 3; as a library page, DOT code 249.687-014, which was light exertional work with a SVP of 2; and as a cashier-checker, DOT code 211.462-014, which was medium exertional work as performed (light work per the DOT) with a SVP of 3.  (AR 87–88.)

The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work experience.  (AR 88.)  The VE was also to assume this person was capable of medium exertional work but can occasionally climb.  (AR 88.)  The individual can understand, remember, and carry out unskilled, routine, and repetitive work that can be learned by demonstration and in which tasks to be performed are predetermined by the employer.  (AR 88.)  The VE was also to assume that the individual can cope with occasional work setting change and occasional interaction with supervisors; can work in proximity to coworkers but not on a team or cooperative effort; and can perform work that does not require interaction with the general public as an essential element of the job but occasional incidental contact is not precluded.  (AR 88.)  The VE testified that such a person could perform Plaintiff's past relevant work of library page.  (AR 89.)  The VE testified further that such individual could perform other, medium jobs with SVP of 2 in the national economy, such as machine feeder, DOT code 699.686-010; vehicle cleaner, DOT code 919.687-014; and industrial cleaner, DOT code 381.687-018.  (AR 89.)  The VE also identified light jobs with SVP of 2 that such an individual could perform, such as photocopy machine operator, DOT code 207.685-014; housekeeping cleaner. DOT code 323.687-014, and apparel marker, DOT code 209.587-034.  (AR 89–90.)  She testified that in her experience none of the identified jobs require reaching overhead more than occasionally.  (AR 90.)

Plaintiff's counsel asked the VE to assume a second hypothetical person with the same limitations as previously identified by the ALJ, but the person would also produce 15% less than an average person and, for greater than 15 percent of the time, they would be unable to maintain

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id*.

1   normal persistence, attention, and concentration.  (AR 91–92.)  The VE testified that there would

2   be no work such a person could perform.  (AR 92.)  The VE further testified that negative reactions

3   to criticism by a supervisor "wouldn't be tolerated on an ongoing basis," even if dealing with such

4   supervisor only occasionally.  (AR 93.)

5   **C.      The ALJ's Decision**

6        In a decision dated January 10, 2018, the ALJ found that Plaintiff was not disabled, as

7   defined by the Act.  (AR 28–42.)  The ALJ conducted the five-step disability analysis set forth in

8   20 C.F.R. §§ 404.1520, 416.920.  (AR 30–42.)  The ALJ decided that Plaintiff had not engaged in

9   substantial gainful activity since March 17, 2015, the alleged onset date (step one).  (AR 30.)  At

10  step two, the ALJ found Plaintiff's following impairments to be severe: ulcerative colitis,

11  depression, personality disorder and post-traumatic stress disorder.  (AR 31.)  Plaintiff did not have

12  an impairment or combination of impairments that met or medically equaled one of the listed

13  impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 32–

14  33.)

15       The ALJ then assessed Plaintiff's RFC and applied the assessment at steps four and five.

16  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before we go from step three to step four, we

17  assess your residual functional capacity . . . .  We use this residual functional capacity assessment

18  at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined

19  that Plaintiff retained the RFC:

20            to perform medium work as defined in 20 CFR [§§] 404.1567(c) and
              416.967(c) except she is limited to occasional climbing.  In order to meet
21            ordinary and reasonable employer expectations, [Plaintiff] can understand,
              remember, and carry out unskilled repetitive and routine work that can be
22            learned by demonstration and that tasks predetermined by the employer.
              [Plaintiff] also can cope with occasional work setting changes.  The residual
23            functional capacity includes occasional interaction with supervisors and
              occasional work in proximity to coworkers, but not in a team or cooperative
24            effort.  [Plaintiff] cannot perform work that has interaction with the public
              as an essential element of the job, but occasional and incidental contact is
25            not precluded.  In addition, [Plaintiff] can perform work that does not
              require overhead work more than occasionally.
26

27  (AR 33.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected

28

14

to cause some of the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record." (AR 34.)  The ALJ determined that, given her RFC, Plaintiff was not disabled because she was able to perform her past relevant work of library page (step four).  (AR 40.)  The ALJ also made the alternative finding that Plaintiff could perform a significant number of other jobs in the local and national economies, specifically machine feeder, vehicle cleaner, industrial cleaner, photocopy machine operator, housekeeping cleaner, and apparel marker (step five).  (AR 40–41.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on August 16, 2018.  (AR 14–19.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

## III.   LEGAL STANDARD

### A.   Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." *Id.* § 423(d)(2)(B).  For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).  "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

1   "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec.*

2   *Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  "The ALJ's findings will be upheld if supported by

3   inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th

4   Cir. 2008) (citation omitted).  Additionally, "[t]he court will uphold the ALJ's conclusion when

5   the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253

6   F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may

7   not substitute its judgment for that of the Commissioner." (citations omitted)).

8       Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a

9   specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*,

10  143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole,

11  weighing both evidence that supports and evidence that detracts from the [Commissioner's]

12  conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

13      Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

14  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

15  454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record

16  that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"

17  *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir.

18  2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking

19  the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

20                      **IV.      DISCUSSION**

21      Plaintiff contends that the ALJ erred in three ways.  First, Plaintiff claims the ALJ erred in

22  not finding her TMJ and bilateral occipital neuralgia "severe" at step two.  (*See* Doc. 23 at 5–8;

23  Doc. 30 at 1–3.)  Second, Plaintiff asserts that the ALJ erred in her treatment of the opinions of

24  Drs. Gallevo, Khurana, and Kenderdine.  (*See* Doc. 23 at 11–17; Doc. 30 at 4–9.)  Finally, Plaintiff

25  asserts that the ALJ improperly discounted Plaintiff's testimony regarding her subjective

26  complaints.  (*See* Doc. 23 at 26–28; Doc. 30 at 9–10.)

27      Defendant counters that that the ALJ did not commit harmful error in deeming Plaintiff's

28  TMJ not severe; properly evaluated Drs. Gallevo's, Khurana's, and Kenderdine's opinions; and

properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and limitations.  (*See* Doc. 27 at 3–19.)

**A.  The ALJ's Error, if any, in Her Step Two Determination Regarding Plaintiff's TMJ and Related Neuralgia Was Harmless**

Plaintiff first contends that the ALJ erred at the second step of the sequential evaluation process by failing to find that her TMJ and bilateral occipital neuralgia were severe impairments. (Doc. 23 at 5–8; Doc. 30 at 1–3.)

At step two of the sequential evaluation, the ALJ determines which of claimant's alleged impairments are "severe" within the meaning of 20 C.F.R. §§ 404.1520(c), 416.920(c).  A severe impairment is one that "significantly limits" a claimant's "physical or mental ability to do basic work activities."  *Id.*  An ALJ must consider all the evidence at step two to determine whether a medically determinable impairment significantly limits the claimant's ability to perform basic work activities. *Id.* §§ 404.1520(a), 416.920(a); *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).  "An impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'"  *Webb v. Barnhart*, 433 F.3d 683, 686–87 (9th Cir. 2005) (quoting Social Security Ruling ("SSR") 96–3p (1996)).  The purpose of step two is to operate as "a de minimis screening device to dispose of groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *see also Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (the step two finding is "merely a threshold determination" that "only raises a prima facie case of a disability."); *Buck v. Berryhill*, 869 F.3d 1040, 1048–49 (9th Cir. 2017) ("Step two is merely a threshold determination meant to screen out weak claims. It is not meant to identify the impairments that should be taken into account when determining the RFC.") (internal citations omitted).

At step two the ALJ found that Plaintiff's severe impairments included ulcerative colitis, depression, personality disorder, and post-traumatic stress disorder, and observed that the medical record refers to TMJ dysfunction.  (AR 31.)  The ALJ's decision not to include TMJ and its related neuralgia as severe impairments at step two is supported by substantial evidence in the record.  In her step-two discussion, the ALJ found that "various treatments were essentially effective" for

18

1    Plaintiff's TMJ dysfunction and that there were no objective medical findings linking this

2    impairment to "problems in the performance of basic work activities." (AR 31.)  The evidence

3    shows that in June 2015 Plaintiff reported getting "some relief" of her TMJ pain from massage and

4    local treatments.  (AR 425.)  In October 2015, Plaintiff's condition had improved so greatly that

5    she cut her dose of medication in half.  (AR 637.)  She continued to receive TMJ massage in

6    November 2015, which helped the condition.  (AR 634.)  As the ALJ pointed out, by December

7    2016, Plaintiff reported that she did not feel like she needed to wear her night guard throughout the

8    day because she was not "not clenching [her] teeth as hard." (AR 1014.)  Impairments that are

9    effectively controlled with medication or other medical treatment are not severe.  *See Sample v.*

10   *Schweiker*, 694 F.2d 639, 642–43 (9th Cir.1982) (mental impairment that was "amenable to

11   control" and "minimized" with medication not disabling); *Bagdasaryan v. Saul*, 787 F. App'x 423,

12   424 (9th Cir. 2019) ("Substantial evidence supports the ALJ's Step Two determination that

13   [claimant's] fibromyalgia was nonsevere" where "[t]he ALJ reasonably concluded from the record

14   that this condition was well-controlled with medication and did not require specialist care").  The

15   evidence identified by the ALJ additionally demonstrates that Plaintiff was receiving effective

16   treatment for this condition within a few months after the alleged disability period began in March

17   2015, which violates the 12-month durational requirement of the Act.  *See* 42 U.S.C. §

18   423(d)(1)(A); *Batson v. Comm'r*, 359 F.3d 1190, 1193–94 (9th Cir. 2004) (the claimant "has the

19   burden of proving an 'inability to engage in any substantial gainful activity by reason of any

20   medically determinable physical or mental impairment which . . . has lasted or can be expected to

21   last for a continuous period of not less than 12 months'").

22       As the ALJ noted, Plaintiff's treating physician Dr. Gallevo indicated in March 2016 that

23   Plaintiff had marked limitation in a variety of basic work activities and could only perform

24   sedentary work due to her TMJ disorder and neck pain.  (AR 959.)  However, as set forth below

25   (*see* Section IV.B.2.b, *infra*), the ALJ properly discounted that opinion because, although it

26   indicated clinical reports were attached, there were no attachments (AR 959) and the opinion was

27   therefore not supported by any objective medical evidence (*see* AR 31).  *Batson*, 359 F.3d at 1195

28   (holding that ALJ properly discounted treating physician's opinion that was not supported by

1  objective medical evidence).  Consistent with ALJ's conclusion that Plaintiff's TMJ and related
2  neuralgia symptoms were effectively controlled, Dr. Gallevo opined that any limitations related to
3  this condition were estimated to persist only six months with medical treatment (AR 960).  Indeed,
4  the medical records on which Plaintiff relies in her briefing support the ALJ's finding that
5  Plaintiff's TMJ condition was effectively treated by at least December 2016.  (*See, e.g.*, AR 788
6  (Plaintiff presents in March 2016 with forms regarding financial assistance for treatment of her
7  TMJ; "doing better overall"; mentions chiropractic therapy and pain when stationary or lifting
8  arms); AR 795 (Plaintiff presents in August 2016 to emergency department due to concussion as a
9  result of a window falling on her head; reports she clenches her jaw at night and she has an
10  unaligned jaw; mentions she is receiving chiropractic treatment for occipital neuralgia and TMJ
11  disorder); AR 866 (Plaintiff reports in May 2016 chiropractor is helping her TMJ/neuralgia); AR
12  905 (Plaintiff's TMJ "in remission" in March 2017).)

13      However, even if the ALJ erred by failing to conclude that Plaintiff's TMJ and related
14  neuralgia are severe, such error was at most harmless.  A claimant is prejudiced at step two by an
15  ALJ's omission of an impairment only where that step is not resolved in the claimant's favor.  *See*
16  *Burch*, 400 F.3d at 682 ("Here, the ALJ did not find that Burch's obesity was a 'severe' impairment
17  . . . .  Assuming without deciding that this omission constituted legal error, it could only have
18  prejudiced Burch in step three (listing impairment determination) or step five (RFC) because the
19  other steps, including this one, were resolved in her favor."); *see also Hickman v. Comm'r*, 399 F.
20  App'x 300, 302 (9th Cir. 2010) ("Any error in the ALJ's failure to include a reading disorder as
21  one of Hickman's severe impairments at step two of the analysis is harmless. The ALJ found
22  Hickman suffered from other severe impairments and, thus, step two was already resolved in
23  Hickman's favor.").  Additionally, the failure to include an impairment in the step two analysis is
24  harmless if the ALJ considers the functional limitations that flow from said impairment in
25  subsequent steps. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that ALJ's failure
26  to list plaintiff's bursitis as a severe impairment at step two was harmless where ALJ considered
27  limitations caused by the condition at step four); *see also Molina*, 674 F.3d at 1115 (error is
28  harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination").

Step two was resolved in Plaintiff's favor when the ALJ determined that her severe impairments included ulcerative colitis, depression, personality disorder, and post-traumatic stress disorder and she proceeded to the step three analysis. (AR 31–33.). It follows that, since Plaintiff's claims were not screened out at this step, she was not prejudiced by any error in the step-two analysis. The ALJ went on to state in her RFC findings that she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence . . . ." (AR 33; *see, e.g., Sara Ann W. v. Comm'r of Soc. Sec*., No. 2:17-CV-00277-RHW, 2018 WL 4088771, at *4 (E.D. Wash. Aug. 27, 2018) ("[T]he ALJ specifically noted that she considered all symptoms in assessing the residual functional capacity. Accordingly, the Court finds the ALJ did not err in the step two analysis, and if any error did occur it was harmless.").)

More significantly, Plaintiff fails to identify any evidence demonstrating that her TMJ, related neuralgia, or any other "somatic" physical impairments caused alleged limitations not accounted for in her RFC.[6]  As discussed below, the ALJ properly weighed the opinion evidence and Plaintiff's symptom claims; and, as a result, the RFC incorporated the limitations supported by substantial evidence in the record, including several mental limitations and limitation of occasional overhead reaching directed to Plaintiff's neck pain associated with her TMJ. (AR 31.) Plaintiff does not contest that an overhead reaching limitation addresses Plaintiff's TMJ dysfunction; she instead asserts that such limitation "does not account for the interrelationship of physical and mental impairments." (Doc. 30 at 3.) Yet, she neglects to specify what additional limitations would account for these impairments and to explain why the various mental limitations in Plaintiff's RFC are insufficient. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability."). The Court therefore finds no error at step two.

---

[6] Plaintiff asserts that her "severe mental impairments are interrelated with her painful, 'somatic' physical impairments which in combination considerably limit her overall residual functional ability." (Doc. 23 at 8.)

**B.    The ALJ Erred in Her Evaluation of Dr. Gallevo's October 2017 Opinion**

    **1.    Legal Standard**

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)). *See also* 20 C.F.R. § 416.927. The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

In this case, Plaintiff alleges—and the record reflects—that Dr. Gallevo was Plaintiff's treating physician. (*See, e.g.*, Doc. 23 at 9.) "If . . . a treating [physician's] opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). *cf. Reddick*, 157 F.3d at 725 ("Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons supported by substantial evidence in the record." (citation omitted)). "If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.'" *Orn*, 495 F.3d at 632 (quoting 20 C.F.R. § 404.1527(d)(2)). *See also* 20 C.F.R. § 416.927(d)(2).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Commissioner] considers specified factors in determining the weight it will be given." *Id.* at 631.

These factors include (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the "[s]upportability" of the opinion;" (4) the "[c]onsistency" of the opinion "with the record as a whole;" (5) whether the opinion is from "a specialist about medical issues related to his or her area of specialty;" and (6) "any other factors [the claimant] or others bring to [the ALJ's] attention, or of which [the ALJ is] aware, which tend to support or contradict the opinion."   20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

Further, "[e]ven if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick*, 157 F.3d at 725 (quoting *Lester*, 81 F.3d at 830). *See also Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).   "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."   *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)); *see, e.g., Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009))); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995))); *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (noting that "inconsistencies and ambiguities" in a treating physician's opinion "represent specific and legitimate reasons for" rejecting the opinion).   "The ALJ must do more than offer his conclusions."   *Reddick*, 157 F.3d at 725.   "He must set forth his own interpretations and explain why they, rather than the doctors', are correct."   *Id.*   (citing *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988)).

Finally, "[e]ven when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to deference.'"   *Orn*, 495 F.3d

1   at 632–33 (quoting SSR 96–2p).  "In many cases, a treating source's medical opinion will be

2   entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling

3   weight." *Id.* (quoting SSR 96–2p)

4       **2.      Analysis**

5           **a.      March 2016 Physical Function Evaluation**

6       On March 30, 2016, Plaintiff's treating physician Dr. Gallevo completed a "Physical

7   Function Evaluation" form for the Washington State Department of Social and Health Services.

8   (AR 958–60.)  Dr. Gallevo indicated that Plaintiff had marked limitation in a variety of basic work

9   activities due to her "TMJ disorder" and neck pain.  (AR 959.)  He further opined that Plaintiff

10  retained the capacity to perform only sedentary work, i.e., "[a]ble to lift 10 pounds maximum and

11  frequently lift or carry lightweight articles [and] [a]ble to walk or stand only for brief periods."

12  (AR 960.)  The ALJ rejected this opinion, finding it insufficient to support a finding that Plaintiff's

13  TMJ was a severe impairment at step two.  (AR 31.)

14      Although not specifically identified by the ALJ as a basis for its rejection, Dr. Gallevo's

15  opinion regarding Plaintiff's TMJ and neck pain impairments is contradicted by the opinion

16  evidence of Disability Determinations Service medical consultant Dr. Irwin, who opined that

17  Plaintiff could lift and carry 50 pounds occasionally and 20 pounds frequently; that standing,

18  walking, and sitting could each be performed for about 6 hours in an 8-hour workday; that Plaintiff

19  was unlimited in the performance of postural activities, except for a restriction to only occasional

20  climbing of ladders, ropes, and scaffolds; and that Plaintiff was unlimited in environmental

21  activities except for the need to avoid concentrated exposure to hazards. [7]  (AR 135–37; AR 151–

22  52.)  Thus, the ALJ was required to state a "specific and legitimate reason," supported by

23  substantial evidence, for rejecting Dr. Gallevo's opinion.

24      In disregarding Dr. Gallevo's March 2016 opinion, the ALJ stated it lacked objective

25  medical findings linking TMJ to problems in the performance of basic work activities—specifically

26

27  [7] The ALJ accorded "partial weight" to the opinion of Dr. Irwin, finding that while the assessment of a medium level
    of physical exertion with lifting and carrying at 50 pounds occasionally and 20 pounds frequently is consistent with
28  Plaintiff's severe ulcerative colitis, the additional portions of the opinion such as the need to avoid concentrated
    exposure to hazards are unsupported in the medical record.  (AR 37.)

a limitation to sedentary work.  (AR 31.)  As the ALJ noted (AR 31), although Dr. Gallevo indicated he attached clinical reports to his form (AR 959), none were attached.  The opinion is further devoid of explanation as to how Plaintiff's alleged TMJ and neck pain translates to the performance of only sedentary work.  That Dr. Gallevo's opinion is not supported by the objective medical evidence is a specific and legitimate reason to reject it.  *See Tonapetyan*, 242 F.3d at 1149 (finding that the ALJ properly rejected the opinion of a treating physician since it was not supported by treatment notes or objective medical findings); *Batson*, 359 F.3d at 1195 (noting that "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings") (citing *Tonapetyan*, 242 F.3d at 1149); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.") (citing *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

Plaintiff's cited medical records from late 2015 and early 2016—including those from Dr. Gallevo himself—note only that that Plaintiff was diagnosed and treated for TMJ (*see* Doc. 23 at 13), and do not support the significant limitations opined by Dr. Gallevo in March 2016.  *See, e.g.*, AR 637, 658 (reporting in October 2015 that she is "doing well," that exercise has been "very helpful" to her TMJ, and that her TMJ symptoms were improved so much that she cut her medication in half)); AR 663 (stating in November 2015 that her TMJ symptoms have sometimes flared, but medication has been helpful in decreasing them); AR 664 (reporting in November 2015 that TMJ has improved with use of night guard); AR 788 (presenting in March 2016 with forms regarding financial assistance for treatment of her TMJ; "doing better overall"; mentions chiropractic therapy and pain when stationary or lifting arms).  *See Matthews*, 10 F.3d at 680.  The Court finds the ALJ's determination reasonable and will not second-guess it, even if such evidence could give rise to inferences more favorable to Plaintiff.  *See Robbins*, 466 F.3d at 882 (citation omitted).  Thus, the Court finds that the ALJ provided a valid specific and legitimate reason supported by substantial evidence for rejecting the March 2016 opinion of Dr. Gallevo regarding Plaintiff's TMJ and neck pain limitations as unsupported by the objective medical evidence.

1                         **b.      October 2017 Medical Source Statement**

2          On October 27, 2017, Dr. Gallevo completed a "Physical Medical Source Statement" form.

3   (AR 1025–30.)  He listed diagnoses of ulcerative colitis, severe PTSD, and occipital neuralgia.

4   (AR 1025.)  He opined Plaintiff was "seriously limited" in sustaining an ordinary routine without

5   special supervision and in working in coordination with or proximity to others without being

6   unduly distracted.  (AR 1026.)  Dr. Gallevo found that Plaintiff was able to sit and stand for 30

7   minutes at a time, with sitting and standing/walking for less than two hours in an eight-hour

8   workday.  (AR 1028.)  He indicated that Plaintiff would need to shift positions and periods of

9   walking around during the workday.  (AR 1028.)  According to Dr. Gallevo, Plaintiff also needed

10  to take unscheduled breaks of 15 to 30 minutes during the workday as often as two or three times

11  every four to five hours.  (AR 1028.)  She could also lift and carry less than 10 pounds occasionally

12  and 10 pounds rarely.  (AR 1029.)  Twisting, stooping, crouching, climbing stairs, and climbing

13  ladders could only be done occasionally.  (AR 1029.)  Dr. Gallevo further opined Plaintiff would

14  be off task 25% or more during a typical day and absent from work for more than four days per

15  month (AR 1029–30).

16         The ALJ assigned "little weight" to this assessment, explaining

17         Dr. Gallevo describes limitations associated with flares of her impairment, which
           describes [Plaintiff] at her worst.  However, such a description has not been the
18         case in the relevant period since the alleged disability onset date of March 17,
           2015, which showed improvement with appropriate treatment.  And as previously
19         noted, her years of successful employment despite her impairments is strong
           evidence of her ability to maintain employment with appropriate treatment.
20

21  (AR 39.)  Although not specifically identified by the ALJ as a basis for its rejection, Dr. Gallevo's

22  October 2017 opinion regarding Plaintiff's impairments is contradicted by the opinion evidence of

23  Disability Determinations Service medical consultants Drs. Postovoit and Fligstein, both of whom

24  opined that Plaintiff retained the capacity to perform simple routine and she could maintain

25  concentration, persistence, pace, and regular attendance within the tolerances of a competitive

26  workplace.[8]  (AR 107, 120, 137–39, 152–54.)  They further found that Plaintiff would be "able to

27  adapt to normal routine changes in a competitive workplace within normal tolerances."  (AR 108,

28
    ---
    [8] The ALJ accorded "significant weight" to the opinions of Drs. Postovoit and Fligstein.  (AR 37.)

1  122, 137–39, 152–54.)  Thus, the ALJ was required to state "specific and legitimate reasons,"

2  supported by substantial evidence, for rejecting Dr. Gallevo's assessment.

3  　　　To begin with, working after the alleged disability onset date does not, *per se*, indicate

4  Plaintiff is not disabled.  *See, e.g., Lingenfelter*, 504 F.3d at 1038 ("[i]t does not follow from the

5  fact that a claimant tried to work for a short period and, because of his impairments, *failed*, that he

6  did not then experience pain and limitations severe enough to preclude him from *maintaining*

7  substantial gainful employment" (emphasis in original)).  Here, it is unclear, and the ALJ does not

8  explain, to what "years of successful employment despite her impairments" she is referring.  Prior

9  to the onset date of March 17, 2015, Plaintiff testified she worked at a library but towards the end

10  she couldn't "keep it together" and not "fall apart" around people.  (AR 81.)  She also missed a lot

11  of work due to her colitis and for "mental health reasons."  (AR 81.)  After the alleged onset date,

12  Plaintiff testified she ultimately quit her job at the library to become a caregiver to her mother-in-

13  law, which ended when she suffered a nervous breakdown and attempted suicide.  (AR 81, 386–

14  403.)  Plaintiff then tried volunteering at a dental clinic, but she couldn't sit, she found the job

15  "stressful," and the dentist "was rather rude" to her, so she "left before there was a scene."  (AR

16  55, 56, 681.)  Despite having made these part-time work attempts after the alleged onset date, the

17  ALJ found that Plaintiff had not engaged in substantial gainful activity since that date.  (AR 30.)

18  Thus, the medical record does not appear to support the ALJ's Plaintiff had "years of successful

19  employment" such that would constitute "strong evidence of her ability to maintain employment

20  with appropriate treatment."  (AR 39.)  This reason for discrediting Dr. Gallevo's opinion is

21  therefore insufficient.  *See Lingenfelter*, 504 F.3d at 1038.

22  　　　The ALJ's other reason for discounting Dr. Gallevo's October 2017 opinion is not a specific

23  and legitimate reason supported by substantial evidence, either.  An ALJ may properly discount an

24  examining physician's opinion that is not supported by the medical record.  *Batson,* 359 F.3d at

25  1195 (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)); *Thomas*, 278 F.3d at 957

26  ("The ALJ need not accept the opinion of any physician, including a treating physician, if that

27  opinion is brief, conclusory, and inadequately supported by clinical findings.") (citing *Matney on*

28  *Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).  Here, however, the ALJ's

characterization that Dr. Gallevo's opinion is not supported by the objective medical evidence, specifically by findings that Plaintiff's condition has improved with treatment since the alleged onset date (AR 39), is based on an incomplete, and therefore inadequate, discussion of the medical evidence.  As the Ninth Circuit has explained, symptoms of mental impairments "wax and wane in the course of treatment."  *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014).  "Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to rely on a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  *Id*. (citing *Holohan*, 246 F.3d at 1205 ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws.  That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect [his] ability to function in a workplace.")).

The ALJ noted the following evidence of Plaintiff's "improvement with appropriate treatment" that she found undermined Dr. Gallevo's opinion: in August 2015 Plaintiff was "doing much better" in therapy (AR 36, 654); in October 2015, her therapist observed Plaintiff was talkative, smiled throughout the session with an "upbeat" mood, and spoke enthusiastically about opening a photography studio (AR 36, 658); she noted in December 2015 that her increase in medication is "helping her depression," and she thereafter expressed an interest in continuing her medication (AR 36, 671, 896, 889–90); and her PTSD was "stable" in 2017 (AR 35, 835).  However, in noting this evidence, the ALJ ignored contrary evidence that *supported* Dr. Gallevo's opinion, including that: Plaintiff was observed to be depressed, frustrated, and angry at a therapy session in May 2015 (AR 618); in June 2015 she was noted she was "distressed, tearful, [with] [suicidal ideation] and thoughts of violence in past several days" (AR 620, 623, 626); she presented with a "mixed" mood at a July 2015 mental evaluation, where there were times when she "unsuccessfully restrain[ed] crying," and she was diagnosed as bipolar (AR 536–37); she started experiencing hallucinations as a result of her medication in October 2015 and it was noted her "biggest problem" was her mental health issues (AR 636); later that same month, she experienced "more depression" and suicidal ideation (AR 660–61); at her medication management appointment

in November 2015, Plaintiff reported ongoing depression and anxiety, was "sad," and was crying

at times (AR 669); at a therapy session in January 2016, she presented with "heightened emotions"

and was "tearful at times" (AR 675); in March 2016 she was noted at a therapy session to be "tearful

and close to being overwhelmed" (AR 683); she experienced "thoughts of suicide and much

increased intensity of emotion" and was "distressed" in August 2016 (AR 879, 880); and in June

2017 she was feeling down about the death of a friend and experiencing anxiety (AR 909).

The ALJ's assignment of "little weight" to Dr. Gallevo's October 2017 opinion because the

record purportedly showed that Plaintiff continued to improve with treatment is based upon isolated

favorable portions of the record. *See Ryan*, 528 F.3d at 1200–1201 ("Nor are the references in [a

doctor's] notes that Ryan's anxiety and depression were 'improving' sufficient to undermine the

repeated diagnosis of those conditions, or [another doctor's] more detailed report."). *See also

Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("Although it is within the power of the

[ALJ] to . . . weigh conflicting evidence, he cannot reach a conclusion first, and then attempt to

justify it by ignoring competent evidence in the record that suggests an opposite result." (citations

omitted)); *Holohan*, 246 F.3d at 1207 (finding that "the ALJ's specific reason for rejecting [a

physician's] medical opinion [was] not supported by substantial evidence" because, in part, "the

ALJ selectively relied on some entries in [the plaintiff's] records . . . and ignored the many others

that indicated continued, severe impairment"); *Reddick*, 157 F.3d at 722–23 (An ALJ may not

"cherry pick" from a record to support the conclusion, but rather must account for the context of

the whole record.).  Further, while Plaintiff may have experienced some "mild" and "moderate"

improvement overall, there is nothing in the medical record indicating that her condition had

stabilized, or the possibility of relapse had been eradicated.  By themselves, notations indicating

that a claimant is doing well or is stable do not contradict a treating physician's opinion of a

claimant's functional limitations.  *See Moriel v. Berryhill*, No. SA CV 17-2215-PLA, 2018 WL

6435325, at *9 (C.D. Cal. Dec. 7, 2018); *Perez v. Astrue*, No. 1:08-cv-0463-DLB, 2009 WL

3011647, at *13 (E.D. Cal. Sept. 17, 2009) (noting that "fairly stable" and "doing well" are relative

terms).  *Accord Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("We also believe that the

Commissioner erroneously relied too heavily on indications in the medical record that Hutsell was

'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity."). Thus, the ALJ's finding that the medical record indicated improvement and therefore did not support Dr. Gallevo's October 2017 opinion, was in error and lacked the support of substantial evidence.

### 3.     Harmless Error Analysis

The Court must next address whether the ALJ's analysis pertaining to Dr. Gallevo's October 2017 opinion was harmless error. *See, e.g.*, *Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) (holding that the "harmless error analysis applies . . . to assess the impact of the ALJ's failure to even mention [a treating physician] or [his] notes, let alone its failure to give specific and legitimate reasons that are supported by substantial evidence for rejecting a treating source's medical opinion" (citation omitted)). The Ninth Circuit "ha[s] long recognized that harmless error principles apply in the Social Security Act context." *Molina*, 674 F.3d at 1115 (citing *Stout*, 454 F.3d at 1054). As such, "the court will not reverse an ALJ's decision for harmless error." *Tommasetti*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citing *Robbins.*, 466 F.3d at 885). An error is harmless "where it is inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (stating that an error is also harmless "'if the agency's path may reasonably be discerned,' even if the agency 'explains its decision with less than ideal clarity'" (quoting *Alaska Dep't of Envtl. Conservation. v. EPA*, 540 U.S. 461, 497 (2004))). "In other words, in each case [courts] look at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. "[T]he nature of [the] application" of the "harmless error analysis to social security cases" is "fact-intensive—'no presumptions operate' and '[courts] must analyze harmlessness in light of the circumstances of the case.'" *Marsh*, 792 F.3d at 1172 (quoting *Molina*, 674 F.3d at 1121). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

In this case, the ALJ's erroneous analysis pertaining to Dr. Gallevo's October 2017 opinion was not harmless. He opined Plaintiff would be off task 25% or more during a typical day and

absent from work for more than four days per month. (AR 1029–30.) The ALJ's RFC determination, while containing several mental limitations, did not include a limitation for such allowances. (*See, e.g.*, AR 33.) If the ALJ had credited Dr. Gallevo's October 2017 opinion, the ALJ's RFC determination—and the outcome of the decision—would likely be different. (*See, e.g.*, AR 91–92 (According to the VE, no work is available a person who would produce 15% less than an average person and, for greater than 15 percent of the time, they would be unable to maintain normal persistence, attention, and concentration.).)

The Court therefore finds that the ALJ's error was not harmless. *Molina*, 674 F.3d at 1115.

**C.      The Court Declines to Determine Plaintiff's Remaining Assertions of Error**

As the Court finds that remand is appropriate for the ALJ to reconsider the medical opinion evidence and re-assess Plaintiff's RFC, the Court does not reach Plaintiff's additional assertions of error regarding the ALJ's evaluation of the examining physician's opinions and Plaintiff's subjective testimony. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Newton v. Colvin*, No. 2:13–cv–2458–GEB–EFB, 2015 WL 1136477, at *6 n.4 (E.D. Cal. Mar. 12, 2015) ("As the matter must be remanded for further consideration of the medical evidence, the court declines to address plaintiff's remaining arguments."); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

**D.      The ALJ's Error Warrants Remand for Further Proceedings**

Where the ALJ commits an error and that error is not harmless, the "ordinary . . . rule" is "to remand to the agency for additional investigation or explanation." *Treichler*, 775 F.3d at 1099 (citations omitted). The Ninth Circuit recognized a limited exception to this typical course where courts "remand[] for an award of benefits instead of further proceedings." *Id.* at 1100–01 (citations omitted); *see also id.* at 1100 (noting that this exception is "sometimes referred to as the 'credit-as-true' rule"). In determining whether to apply this exception to the "ordinary remand rule," the court must determine, in part, whether (1) "the record has been fully developed;" (2) "there are

1    outstanding issues that must be resolved before a determination of disability can be made;" and (3)

2    "further administrative proceedings would be useful." *Id.* at 1101 (citations omitted).  As to the

3    last inquiry, additional "[a]dministrative proceedings are generally useful where the record has not

4    been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of

5    further evidence . . . may well prove enlightening in light of the passage of time." *Id.* (citations

6    omitted).  Ultimately, "[t]he decision whether to remand a case for additional evidence or simply

7    to award benefits is in [the court's] discretion." *Swenson*, 876 F.2d at 689 (citation omitted).

8        Having found that the ALJ failed to articulate specific and legitimate reasons, supported by

9    substantial evidence, for rejecting the October 2017 opinion of Plaintiff's treating physician, the

10   Court finds that the "credit-as-true" exception to the "ordinary remand rule" is inapplicable because

11   additional administrative proceedings will be useful.[9]  In particular, the ALJ's RFC determination

12   conflicted with the October 2017 opinion evidence of Dr. Gallevo—as well as other evidence and

13   testimony in the record.  The error identified above can be remedied with further proceedings to

14   accord an opportunity to the ALJ to resolve this conflict. *Cf. Dominguez v. Colvin,* 808 F.3d 403,

15   408–09 (9th Cir. 2016); *Lule v. Berryhill*, Case No.: 1:15-cv-01631-JLT, 2017 WL 541096, at *6

16   (E.D. Cal. Feb. 10, 2017) ("When there is conflicting medical evidence, 'it is the ALJ's role to

17   determine credibility and to resolve the conflict.'") (quoting *Allen v. Heckler*, 749 F.2d 577, 579

18   (9th Cir. 1984)).  On remand, the ALJ should address this error by properly evaluating the medical

19   evidence, including the opinions of Plaintiff's treating and examining sources, and re-assess

20   Plaintiff's functional limitations in light of that evaluation and the other medical evidence of record,

21   including Plaintiff's subjective complaints.

22        Accordingly, the Court shall remand this matter for further proceedings.

23                    **V.      CONCLUSION AND ORDER**

24        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

25   substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further

26   proceedings consistent with this Order.

27   ///

28
---
[9] Plaintiff does not argue for the application of the "credit as true" rule nor for remand for the payment of benefits.

1       The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Regina Faye

2   Evanovich and against Defendant Andrew Saul, Commissioner of Social Security.

3

4   IT IS SO ORDERED.

5   Dated:   **July 17, 2020**                                    /s/ *Sheila K. Oberto*

6                                                         UNITED STATES MAGISTRATE JUDGE